Good morning, Your Honor. Mark Peterson on behalf of Gerald Kellogg, the appellant in this matter, with me today are Mr. Kellogg and my co-counsels Nora Kane and Tom Williams. Your Honor, the core of this appeal is the Court's failure to give any relief to Mr. Kellogg in the face of his detailed findings of severe and significant litigation misconduct, all calculated to confuse and obfuscate the issues, misdirect the jury's focus, give superficial recognition to the Court's... Well, the Court kind of dealt with that through its attorney fees, didn't it? I don't think it did, Your Honor. The attorney's fees that were granted in this matter dealt with the 285 and the Rule 41 based upon those statutes, dealing with the frivolous obviousness defense and counterclaim that was raised and litigated all the way up until 10 days before trial. That was the basis and the percentage of fees that was given on the basis of that obviousness counterclaim and the finding that the Court also found that those acts in pursuing that counterclaim were frivolous, were vexatious, and were done in bad faith. The fees were for that conduct and there are no fees and no new trial or any relief given to Mr. Kellogg at all for the misconduct that was found throughout the trial, and specifically the misconduct of just simply violating the Court's orders. The Court set forth what the playing field was going to be, clearly, and whether that decision is right or wrong, I would submit, is not before this Court. The issue is, as the judge set forth, here is what we're going to find. But the judge, as you say, set the rules and the judge reviewed then the record and said the jury's verdict is sufficiently supported by the evidence and he is not going to disturb it. So how do we deal with the very person you are appealing to seems to be not in support of your argument? Your Honor, what we've defined this as is kind of the left-hand turns. We believe there were three. There were factual findings, first of all, as to the misconduct during the trial. The left-hand turn was then not to award a new trial to Mr. Kellogg, and there is a left-hand turn. And, Your Honor, I would submit that that is an abuse of discretion under the Fragi, if I'm pronouncing that correct, decision from this Court as well as the U.S. Supreme Court some time ago that Fragi relied upon, which was Minnesota v. Moaklin, whereas the Court found... But you realize we're going to have to find some major miscarriage before we're going to say that one of our colleagues abused their discretion. This is their call. We weren't there. It's hard for us to say that they're wrong. Your Honor, I think that this is a situation where the Court has found, unlike the Medtronic's case that was before this Court a year or so before, that actually found that here is some misconduct. There are specific findings of here are the things that I set forth, what they were obligated to do, and here are the things that they violated. I believe that not only is it good precedent, but it has to be precedent that if you violate those orders, if you make a finding that you intended and had a strategy to violate those orders, that there has to be a new trial. To do so will only create incentive for like-positioned folks, such as Nike, to, especially when the dollars are so high, to take the risk to violate those orders and then try to come up to this Court and justify their position. I think the trial court here, simply as a matter of law, under Frege, as well as the other circuits that we cited in our brief, have unanimously determined that if you find those, that misconduct, and that you violated those orders throughout the trial or thrown the proverbial skunk into the jury box continuously, that there has to be a new trial. Mr. Kellogg has yet to have a fair trial on his issues, on the issues that the Court set forth that we would present to them. And I think it is an abuse of discretion, not in his findings, but in not allowing the new trial, or not allowing some sort of sanction to come out of the misconduct that occurred during the trial. And in this case, Mr. Kellogg has received nothing. I mean, absolutely nothing. The two other left turns, if I may, that we find is that there was a specific finding by this Court that it was a correct statement of law, given the Crocs case that's come out since, as well as the Egyptian goddess which came out during our trial, was that it is a correct statement of law that we are not to focus on, or concentrate on, the minor details, as well as if the minor details are not to be used and shall not be used as a basis of non-infringement. That has been— Now, minor differences really applies when the design has thousands of features, when it's a complex piece of furniture with three-legged claws and animal features, and they left off one tooth and a little ear from the lion's head. That applies in that context. Here, there really is only one feature, and a minor difference in that feature becomes far more significant, doesn't it? Your Honor, I think that, as I understand the Crocs decision, the Crocs decision said is what you do now after Egyptian goddesses, you take the prior art, and you determine how far the jump is from the prior art to the patent itself, the patent in question. I agree that if the area of art is crowded, I believe as the Court has indicated, then the ordinary observer is going to pay much more close attention to those details, and a minor distinction may indeed make a difference. But isn't that what the jury did? I would say, looking at the samples, there are a lot of similarities. Isn't this a jury question? Your Honor, Judge Battalion certainly found it to be a jury question with respect to, as he described it, we are going to deal with that which is novel from the prior art. I think his Markman ruling, I think, accurately depicts what was found in Crocs. We're going to look at the prior art. We're going to find what is the new and different aspect of it, because that's what the ordinary observer is going to be directed to or focused upon. He used the instruction, Egyptian goddess had just come out, and he instructed the jury to look at the entirety of the device, and there are many similarities, and this is why the jury, having had the benefit of, I assume, extensive debate and demonstration and all the rest of it, it may have been a close question for the jury, but it was decided. Your Honor, but the issue I would take with that, as well as Judge Battalion did throughout the trial, is there were numerous arguments and evidence put in by opposing counsel that had nothing, absolutely nothing, to do with the patent itself, well beyond the scope, such as what type of person wears the cap, what does it look like from the inside out, what type of fabric is it, what type of logos are on there or not on there. Judge Battalion, what we understood the playing field to be is we're going to look at the crown of that cap and determine whether or not those vents in an X-shaped pattern along the seams was substantially the same. That's what we went into, just as Judge told us to do. We went into that, and Nike was trying a completely different case. That is why, you know, it became, you know, animosity is, you know, a kind word for what happened during that trial, and the frustration that generated. Nike didn't try the case that Judge Battalion and we were trying because their own folks, namely Mr. Taguchi and Mr. Green, when asked about that question, asked about, okay, let's look at the four vents in an X-shaped pattern. When you look at those, their answers were point-blank. No ordinary observer is going to see that difference. Us, you know, us folks that design these things, we may, but before that, people aren't going to see it, and I would submit to you of all the folks in the world that probably know what the ordinary observer is going to notice and not notice in those four vents and whether or not there's a substantial, you know, substantially the same between those two, is probably Mr. Taguchi possibly on that issue, simply because he's working for one of the largest apparel company, if not the largest apparel company, and his job is to, that's his job, to make it unique or different for purposes of Nike. It's how they sell their product. This was what they became to say was iconic, just like Jumpman, and this was hugely important to him, and his comment was, with respect to the issue that was to be tried, and I would submit absolutely consistent with Crocks and with the judge's analysis. Is it your opinion that individuals in Nebraska would not be ordinary observers? I mean, it was, we did have a jury decide this issue. You know, all right, I better say yes if I'm going back there to say they're ordinary folks. The answer to that is absolutely, I think they were, and my, the issue that I had with the jury instruction is I don't think it was complete, because it didn't give the minor differences language, and secondly, I think that the issue that I have with the way it was presented was, is there was all this extraneous evidence, which was strictly prohibited to be put in, and that gets back to the Fragy opinion, as well as the U.S. Supreme Court opinion, says look, once there is misconduct, once you have violated those orders, and you have done so with a strategy to you can't go back, and I think this is where Judge Battaglia made the left-hand turn in air, was you can't go back and then try to determine, well, how much, or for the most part, or for a little part. The Fragy case and others, as I understand it, say that you, there is a presumption at that point made that it has influenced the jury. You don't go back and re-weigh it at that point, and for good reason. If you were to do that, again, folks similarly situated, or even on the plaintiff's side, if you didn't like the Markman order, you would just present that evidence as you saw fit, and then come up to this court and say, I was right in doing it, because the Markman said what it said. But Mr. Taguchi did find some differences. He found that the Nike vent was a half moon, not a slit, and that it was filled with mesh. And, of course, the district court thought that this evidence was sufficient to allow the jury to make the decision. And I believe, Your Honor, what Mr. Taguchi found is, yeah, that is there, but when asked about would the ordinary observer see that as substantially the same, his answer was, only us designers would see that as a distinction. And further said that once you put it on your head, we've got some over there, once you put it on the head, the way it stretches, it becomes identical to the football shape on Mr. Kellogg's 190 patent. And I see I'm way past my rebuttal time. Thank you, Mr. Peters. We'll preserve the remainder of your time. Mr. Webb. Thank you. Trent Webb on behalf of Nike. Before I begin my discussion, I want to correct the record about what Mr. Kellogg said about ordinary people not knowing the differences in the vents. He was talking about the taping of the seam underneath the hat, on the inside of the hat. He said that was one of the unique features of his hat. He said that's something that was really cool, but ordinary people wouldn't see it. He did not say ordinary people would not notice the shape of the vents. And that is, again, at page A-5-17 and A-5-18. And there are other inaccurate citations to the record I'd also like to address. First, with respect to the Kellogg claims, she admitted that the Nike hats had all the elements of the claim as construed. And they said that at yellow brief, page 41. She did not even address the overall visual impression. And that was the focus of Nike's case. And finally, again, if you look at the blue brief, one of the instances of alleged misconduct that is most disturbing is in Kellogg's brief where they say that the judge instructed us not to mention trucker hats. And then within minutes, as they said, we went on and asked the jury about trucker hats. In actuality, the timing was reversed. We discussed trucker hats during voir dire. The colloquy happened after voir dire. Importantly, during voir dire, the claim construction called for a baseball style cap. At that time, it was fair game as to whether or not these hats were, in fact, baseball style caps. More than that, the evidence would have been and was that Nike hat purchasers are very discriminating. They look at a very focused on specific things about their hats. They're discriminating purchasers like in Goodyear and like in Armanac. And that is directly relevant to the issue of infringement. And as this court said in Goodyear, it does not pertain to claim construction when you're talking about the ordinary purchaser. During voir dire, we were trying to ascertain if people would be unwilling to consider that. If they would be hat's a hat. That is a person that we wanted not to be on our jury when we're talking about those types of things. The colloquy happened after that at a time when the Egyptian goddess came down and the parties had discussed it. As this court has recognized in the Medtronic v. Brain Labs case, because of the substantial economic and reputational impact of awards for attorney's fees, it is this court's responsibility to examine the actual record will reveal that the district court's ruling for finding of fees was full of egregious legal error and patently erroneous factual findings. There was no discussion during Mr. Peterson's argument about the prevailing party issue. I think that is fairly clear cut. Mr. Kellogg is not a prevailing party under the Gentry Gallery case. Under Brooks Furniture, they did not obtain any benefits they sought to obtain by the filing of this lawsuit. And as this court held in the Shum case, there can only be one prevailing party, and that is Nike. But the court could find that the fee award should be reversed based upon the prevailing party issue alone, but it should not. Because as this court stated in Medtronic, it is its responsibility to examine the record to see if clear error occurred with respect to the exceptional case finding. And that is what must happen here. Because in this case... At different times, the district court held that Nike was arrogant, abusive, frivolous, intentionally delaying proceedings, obfuscating issues, and increasing Kellogg's costs of litigation. It seems like those various findings at different points tend to support the court's judgment on the fees issue. That's precisely why this court should go and look at the actual record. Again, the court's order, which was so heavily relied upon by the plaintiff, is not really the issue. The issue is you have to look at the underlying record in the case. What really was their misconduct? Did Nike do something wrong? And if you look at the totality of the record, here are some things that give you some context as to where the judge was coming from. First, as early as March, the judge took issue with Nike through another law firm, submitting an amicus brief in the Egyptian Goddess Appeal, advocating for the elimination of the point of novelty test. Yet in this case, the point of novelty was still the law up until the first day of trial. So Nike moved for summary judgment on point of novelty. The judge said he was troubled by this inconsistency. Even in his order, footnote 2, he talks about how he's troubled by this inconsistency between advocating for a change in the law and actually applying the law as it existed. That is not inconsistent. Yet the judge was troubled by that throughout, as a matter of fact, the first day of trial. He asked us... Counsel, when you moved to dismiss your claims of invalidity and the court reviewed the motion, isn't that a judicially charged action? No, it isn't. It's a Rule 41 motion where we moved to dismiss our case with prejudice to streamline our presentation. It had to be acted on by the court. The court granted our motion without any conditions. Now, I'd like to hear any statements you have, whether that's a judicially enforced action or not, or a judicially sanctioned action. The court granted our motion, and it was a dispositive motion as it pertains to our validity counterclaim. But under Rule 41, the fee provision of Rule 41 requires that the movement be given a chance to accept the conditions or reject them. And in here, notwithstanding that Kellogg moved for fees in connection with that, the court considered it and decided not to award fees. Under Rule 41, if fees are to be assessed, the movement has to be given the opportunity to either accept those conditions or not. And had Nike been given that opportunity as to whether to pay fees or to go forward, we would have gone forward, obviously. This was an effort to streamline the presentation of our case, period. But keep in mind, again, so that's – so the judge believed that we were – we were dishonest by advocating for a summary judgment motion on point of naughty, but also advocating for change in the law. Wait a minute. Why did you move to dismiss it with prejudice? That seems pretty odd to me that you would give up this claim that you're here in court about. Well, frankly, here's how the context worked. On the eve of trial, we decided to get rid of that claim. There would be no need to keep the claim without prejudice for purposes of pursuing it down the road, because once you win the trial, it's really – you have no interest in invalidating the patent from that point forward. Moreover, in terms of getting it dismissed, we went to the other side and asked for the dismissal, offered it with prejudice. They objected. They did not want it to be dismissed at all. So that was the strategy decision we made at the time to get rid of that counterclaim with prejudice. And on that counterclaim, it was based upon prior art that was not before the examiner. The Cronenberger patent was our primary reference, along with the Rothschild reference, which was excluded by the court, again, because it was too old and a woman's hat. But separate apart from that, those – the prior art was better than anything before the patent office. We had an expert who survived, Daubert, who would have offered uncontradicted testimony at trial about the validity of the hat. So that was not a frivolous claim, and no decision by the court even addressed the merits. And this gets to my second point that really provides context for the court. The court found that our pursuit of invalidity, even though we had our own patent, was improper. As a matter of fact, he said that by virtue of having our own patent, it effectively foreclosed any ability for us to challenge the validity of their patent. And I think that's why the judge found this to be a frivolous counterclaim, because the judge believed that you could not pursue validity if you had your own patent. Is this case an exceptional case for purposes of the attorney fees? It is absolutely not. Absolutely not. And again, if you look at the record, you can basically capture the majority of the alleged misconduct by the concept that we pursued validity even though we had our own patent. The fact that we pursued a change in the law even though we advocated for a point-of-novel-to-summary judgment motion. The fact that we discussed features of our hat. Keep in mind, when we discussed the features of our hat, even though the judge said that we could discuss the overall visual impression of our cap, we met with it. Mr. Webb, I'm looking again at the court's opinion. It says, it's concluded that Nike engaged in litigation misconduct. Misconduct was that they continued to pursue the invalidity claim vexatiously. Vexatious conduct includes conduct that clouds the issues. The deposition, testimony, and expert report were factually and legally untenable in light of the court's claim construction. Nike pursued a strategy of giving superficial recognition to the court's claim construction while continuing to press its own interpretation of the claim. On and on and on. How do we second-guess that, having not been there at the trial? A couple of reasons. Number one, Medtronic's decision. Because, again, of the reputational and economic impact of an order like this, it's the court's responsibility to go and actually look at the record, not just what the judge viewed the record, but look at the actual record and view the context of what was happening. And in this case, again, numerous issues with respect to uncertainty. Again, during the colloquy, we specifically asked, what could we talk about, what could we not talk about? The judge said, you could talk about the overall impression of Nike's products. Yet when we did that, we were met with objections that were sustained. The court said, you could talk about whether mesh within the vents was an issue of infringement for the jury. We could talk about that, which we did with Mr. Kellogg and Mr. DiGucci. But when Mr. Green talked about it, objection claim construction sustained. There were shifting sands with respect to the rules of trial. We tried our very best to adhere to them. But the bottom line is, the court didn't think we were just wrong. They thought we were dishonest because of the Egyptian gods. You won. Should we send the whole thing back? Absolutely not. You should have. I mean, you want us to say he sustained the jury appropriately, that there was no misconduct on that part. And yet you question his judgment when it hurts you. Is there any inconsistency in your positions? No, Your Honor. What we want is for this court to look at the record. That is as simple as I can make it. Because if you look at the record and look at the actual accused instances of misconduct, you will see that none exists. And that is consistent with the finding that JMOL denial should be affirmed, new trial denial should be affirmed, and most importantly, that the finding of an exceptional case should be reversed. There simply is none. And the lasting effect of an order like this echoes for many years to the detriment of Nike. And that's something that this court has an obligation to review. Sometimes trial courts get it wrong. Sometimes their view of the law is inconsistent with the law. And when they make decisions based upon their view of the law that happens to be incorrect, that colors everything they do. And that is what's happened here. The judge believed that we violated his claim construction order. Well, then they should get a new trial. The new trial motion was filed and denied. And here's what the court found. The court found that notwithstanding our... The arguments that you give are classical arguments as to why there should be a new trial. The judge considered these issues for a new trial that were filed by Kellogg. He found that our conduct was unavailing and transparent, that curative instructions fixed any potential harm, and notwithstanding the judge's view of our conduct, that Mr. Kellogg was not deprived of fair trial and Nike did not unfairly influence the jury. So notwithstanding the judge's view of our misconduct, as bad as he said it was in his order, he still found that a new trial was not warranted. But beyond that, and again, I'd be happy to address any specific instance of misconduct that you have in mind because what we want to do today is to resolve any doubts that you have, to make sure your understanding of what happened at this trial court is full and complete. Because ultimately, we're not here to try to argue right or wrong. We want you to focus on the record because the record speaks much more persuasively on this than I ever could. How is the material on the cap relevant to the design? It went to, again, talking about the ordinary purchaser. This was an important part of our case. I'm talking about the material that you were talking about underneath. Oh, underneath. Why is that relevant in a design case? The central approach by the plaintiff in this case was copying. They said that they sent to us this GK3 drawing twice and that we kept it and we stole their idea. Stole their idea. That was testimony in front of the jury. We had to refute that. So Mr. DiGucci actually talked about how he designed his cap and why he designed certain features the way he did because the jury heard from opening statements and from Mr. Kellogg's direct testimony that Nike stole this hat. The closing argument. I want you to take this hat. I want you to look at it. Turn it inside out. Mess with the strap back there. Try it on like an ordinary observer. What's the strap have to do with it? That was testimony with respect to touch, feel, try on that Ms. Kelly provided with respect to how and that's at appendix 901. But what's the strap have to do with the pattern on the top? It had to do with trying on the hat. And again, with respect to trying on the hat. But I can understand why the district judge might feel like you're stepping over the line there. Well, from my standpoint, I don't. Number one, it wasn't objected to. But more than that, that was simply going to the ordinary observer test. Again, testimony from Ms. Kelly, which was focused on our ordinary purchaser and what they do when they buy a hat. They go to a retail store. They look at hats. They try them on to see how they look and fit. And that's part of what they do. And just like in Armanac, when you have that level of discrimination and scrutiny, the likelihood of confusion or this similarity and deception goes down. And so Armanac and Goodyear all stand for that. So in a design case, is it your argument that functionality plays a larger role? Absolutely not. As a matter of fact, under Egyptian gods, they say that a verbal or written claim construction usually is unnecessary. But there are three reasons why it is. One of those is for the judge to say these features are functional, not part of the patent. These are ornamental. They are. And to talk about prosecution history issues, to talk about drawing conventions. And all three of those existed in this case. And as an alternative grounds to affirm the denial of GMOL, those claim construction elements should be in the claim. Thank you, Mr. Webb. We've consumed your rebuttal time, but we'll give you back three minutes. And if you'll give an additional three minutes to Mr. Peterson, we'll keep the time about even. Fair enough. Thank you. There you go, Mr. Peterson. You have six minutes. All right. Thank you, Your Honor. First, let me respond to the Section 285 and the 41, which was raised most recently in the argument by Mr. Webb. And I believe that there certainly was at the time that they filed their notice and motion. I'll get to that in a second. But there was a judicially imposed change in the party's relationship at that point. There was a dismissal with prejudice of their counterclaim. And I think under the highway transport case that clearly at that point there has been a change and therefore a basis for Section 285 and certainly under Rule 41 sanctions. The Gentry case and the Shum case, if I can read my writing correctly that came out later, I think those cases stand for the proposition that if there is no change in position between the parties until the absolute conclusion of the trial, sure, at that point there's only one winner and you're not going to bifurcate as to what counterclaims prevailed and which ones didn't. That makes sense. But in this case certainly there has been a change as well. Under Rule 41, the one thing I'm not sure that our briefing was clear enough on as I read it, and I want to make sure the Court is clear, with respect to context of what happened with respect to the Nike counterclaim. Nike didn't file a motion to dismiss their counterclaim to try to determine what the condition was going to be if they dismissed and in the comments now that, oh, we would have gone forward. The evidence is, and this is at A3034 through 30, yeah, 3034 through 3045, they filed a notice to dismiss. They wanted that case or that part of it to go on as quickly as they could because their expert witness actually provided very favorable testimony to us on infringement. And we wanted him there. We within 12 hours filed, and you will see, a fairly hot response about how frivolous this claim was, how we were entitled to fees and expenses under Rule 41, citing the same cases that we've cited to this Court. I'm done and there's another case and I can't remember it, but stating that, look, the Court retains the jurisdiction to decide this afterwards. Bottom line was, we want their expert here so we can use him in our case in chief. The Court denied that, but to now stand and say, gee, that was, you know, we wanted a condition, I think is improper and completely contrary. You know, the cross, the counterclaim with their expert was exactly what was wrong in this case throughout the entirety. What they were using him for and what they tried to do is create a virtual checklist of non-infringement. They were trying to take all sorts of items that they tried in Markman, tried through summary judgment, tried in motion in limine, and then did it over objection and the Court's order through trial. And those checklists included things that had nothing to do with the patent, such as what type of person would wear it. You know, was it a guy that drives a truck or is it a guy that plays sports? How's that strap work when you're running? You have a comment? Was the strap part of the claim construction? It was. Well, Your Honor, it was in the sense that it was proposed by Nike along with all sorts of other details. I mean, every single detail you can measure. It was, you know, it was four paragraphs. They're three paragraphs long is what they wanted during the claim construction. Judge Battaglione rejected that and gave the claim construction that you see. So in a sense, I think it was. Okay. So it wasn't specifically said no, but it was in the sense that they had asked for it. It was rejected. They offered it again as a jury instruction and they offered it during the Rule 50 at the conclusion of the trial. So certainly they were trying. That was... There were all sorts of other material, what it looked like from the inside out, as well as the strap, the button, the stitching. They tried to get all this giant checklist in, which Kroc says you're not supposed to do, and that's what they did. And instead of... They did the frontal attack during the Markman and then in trial they went around the back door and said, well, here's our hat that doesn't have all this stuff. And then stood up during closing and said, I want you to go back and feel it and touch it and move it around and do all this sort of thing, implicitly arguing exactly what the court had rejected. And that's exactly why the judge got so upset. And that's why we were going crazy as best we could. And now the excuse is we didn't object enough. I mean, it's back to the evidence 101 in law school is how many times do you have to object to the question of, did you beat your wife again this morning? I mean, that... It is, as the Eighth Circuit says, which I think controls it, it's a diminishing return. And in fact, we went to the extraordinary measure of actually asking for a motion in limine order to stop this nonsense. I mean, you would think that the Markman would be enough. But we could see during the discovery, the summary judgment and everything, this is what's coming. We asked for the motion in limine. These folks said exactly... They said, I understand your explicit order, Your Honor. I understand the explicit order of Markman. And then proceeded to ask, can I talk about Trucker's cap and everything else? The judge says, absolutely no, we've already gone there. We're not going there again. And every witness comes up, you would ask a question and they would come out with the rehearsed answer of, you know, this hat's different because Truckers wear this type of hat, not sports people such as Nike. That, along with everything else, was just bombarded into the jury box and that's why Mr. Kellogg deserves a new trial with the proper instructions set forth in Crocs. And he's entitled to that. He's entitled to some relief for the misconduct that was given. Misconduct that's... with respect to the counterclaim has been dealt with by the court as they seem... as he saw fit with respect to the fees and costs and those are certainly a small percentage of the overall fees and costs that were incurred in this case. And Mr. Kellogg sits here today still with not the opportunity to ever present a fair case in front of the trial pursuant to the laws of design patents and... and that is our position. And unless the court has other... Thank you, Mr. Peterson. Thank you. Mr. Webb, you all are causing me great concern. I'm afraid I've been wearing a Truckers hat to play tennis. It might be affecting my game. A couple... a couple of things, Your Honor. With respect to whether we file the notice of the motion, Appendix A3042 is our motion to dismiss its counterclaim with validity pursuant to Rule 41. Also, with respect to... with respect to whether there's a judicial change in position with respect to the Rule 41 motion, that was dealt specifically with Brooks Furniture and found it was not. They did not create a prevailing party. Mr. Kellogg came to trial with a patent that was not infringed and valid. He left trial with a patent that was not infringed and valid. There's no change in relationship which is also stated in the highway transport case relied upon by Mr. Kellogg. With respect to... Now, if Kellogg sues Nike for infringement on a different product using this same patent, will Nike be able to raise validity? No. Hmm. Sounds like a change in position. Well, actually, Your Honor, with respect to prevailing party, the change in position would affect the parties in this dispute. If we come out with a new hat, a new hat entirely, they can sue us on it. But with respect to... You're not going to be able to attack their patent for validity? That is correct. That is correct. Is that sufficient under our case law? It is not. To be a change in the legal status of the parties? It is not. With respect to... And again, this happened with Brooks Furniture. A party dismissed their claim... And the court there found that that did not give rise to a prevailing party status. I also want to address the virtual checklist as well. Again, we moved in Lemonade to preclude the plaintiff from using a checklist. And it was prohibited in Crocs as well. We filed a motion in Lemonade to preclude the use of a checklist. The court denied it and said that the use of a checklist was appropriate. And the plaintiff used that with all of our witnesses and in closing argument a checklist. We said look at the overall visual impression. Throughout the course of trial based upon what happened with the judge including moving for a mistrial based upon his admonition of Ms. Williams and other conditions from the court. But ultimately what happened is we became sideways with the judge. We believe based upon the judge's assumption that we couldn't pursue validity that our amicus position was dishonest and that each time we talked about our hat was related to claim construction.  Ms. Williams and Mr. Davis they called her as an adverse witness offered into evidence letters where she wrote talking about our positions non-infringement before trial. Yet when I asked her questions about those same letters objection claim construction that's where the judge became so angry with us. We were asking about letters that were received in evidence that were offered by the other side and the door was slammed shut. In addition every time we talked about features the same thing. All we ask in this appeal is that the court look at the    before the court. Thank you.